## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID SMITH**, *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| **v.** | : | **NO. 16-156** |
| | : | |
| **AMERICAN AIRLINES, INC.**, *et al.* | : | |
| *Defendants* | : | |

**FILED**

AUG 1 2 2016

LUCY V. CHIN, Interim Clerk
By _____ Dep. Clerk

NITZA I. QUIÑONES ALEJANDRO, J.                                    AUGUST 12, 2016

# MEMORANDUM OPINION

## INTRODUCTION

Presently before this Court are: (1) the motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), by Defendants American Airlines, Inc., ("AA"), US Airways, Inc., ("US Airways"), W. Douglas Parker, Robert D. Isom, Jr., Stephen L. Johnson, Bob Ciminelli, Cedric Rockamore, Ariel Morales, Shelly Wattman, Robert Yori, and Manal El-Hajal (collectively, "Defendants"), [ECF 6]; (2) the response in opposition filed by Plaintiffs David Smith, Andre Fields, Kendall Green, Andre Roundtree, Trandom Milsip, Emanuel Taylor, Tyesha Johnson, Kellen Pinckney, and Charles Trower (collectively, "Plaintiffs"), [ECF 11], and; (3) Defendants' reply. [ECF 13]. In their motion to dismiss, Defendants essentially argue that the Pennsylvania Workers' Compensation Act, 77 Pa. Stat. Ann. §§ 1-2708, (the "PWCA"), is the exclusive remedy available to Plaintiffs and, therefore, this matter should be dismissed.

For the reasons set forth, this Court agrees, and the motion to dismiss is granted.

## BACKGROUND

Plaintiffs filed a second amended complaint against Defendants in state court, [ECF 1(4)] ("Sec. Am. Compl."), asserting in Count I a claim for medical monitoring on behalf of themselves and all other similarly situated individuals, and state law claims on behalf of *only*

themselves; *to wit*: negligence (Count II); battery (Count III); public nuisance (Count IV); violation of the Pennsylvania Clean Streams Law; fraud (Count VI); civil conspiracy (Count VII); and breach of contract as third-party beneficiaries of the contract between Defendant AA and Deer Park/Nestle (Count VIII). (Sec. Am. Compl. at ¶¶ 150-218). On January 13, 2016, Defendants removed the state court action to federal court pursuant to the *Class Action Fairness Act of 2005* ("CAFA"),[1] contending that Count I is asserted on behalf of a class of more than 100 potential plaintiffs, the amount in controversy exceeds the sum or value of $5,000,000, and several Plaintiffs are citizens of Pennsylvania,[2] while Defendant AA is a citizen of Delaware and Texas.[3] [ECF 1 at ¶ 11].[4]  On January 26, 2016, Defendants filed the instant motion to dismiss.

When ruling on Defendants' motions to dismiss, this Court must accept, as true, all relevant and pertinent factual allegations in the second amended complaint, and construe these factual allegations in the light most favorable to Plaintiff.[5]  The relevant factual allegations gleaned from Plaintiffs' second amended complaint are summarized as follows:

> Plaintiffs are all currently employed by Defendant AA, and work at the Philadelphia International Airport as either fleet service agents or, in the case of Plaintiff Trower, as a customer service agent. (Sec. Am. Compl. at ¶¶ 18-26). Fleet service agents are responsible for emptying an airplane's lavatory tanks of

---

[1]     "CAFA provides federal courts with jurisdiction over civil class actions if the 'matter in controversy exceeds the sum or value of $5,000,000,' the aggregate number of proposed class members is 100 or more, and any class member is a citizen of a state different from any defendant." *Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 503 (3d Cir. 2013) (citing 28 U.S.C. § 1332(d)(2), (d)(2)(A), (d)(5)(B)).  Unlike the complete diversity required by 28 U.S.C. § 1332(a)(1), CAFA's "minimal diversity," only requires that one plaintiff be diverse from one defendant.  *E.g., Whitaker v. Herr Foods, Inc.*, 2016 WL 4060127, at *2 (E.D. Pa. July 29, 2016).

[2]     Seven of the Plaintiffs are citizens of Pennsylvania, and two are citizens of Delaware. (Sec. Am. Compl. at ¶¶ 18-26).

[3]     Under 28 U.S.C. §1332(d)(2)(A), district courts have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.

[4]     In their Notice of Removal, Defendants do not identify the citizenship of any of the Defendants except for Defendant AA.

[5]     *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

2

human waste after each flight, and then filling the lavatory tank with a chemical solution known in the industry as "blue juice." (*Id.* at ¶ 44). Blue juice contains ingredients and toxins that inhibit the odor of the human waste during the flight, and which must be disposed of in accordance with some unspecified regulation.[6] Blue juice contains, among other chemicals, 2-Bromo-2-nitropropaine-1,3-diol, which Plaintiffs contend is toxic to humans who come into contact with it, or who consume it. (*Id.* at ¶ 46).

Plaintiffs described the procedure for cleaning an airplane's lavatory as follows: a fleet agent drives a lavatory truck to the airplane and attaches a hose to one of the valves under the airplane to empty any human waste from the lavatory into a receiving container on a truck. (*Id.* at ¶ 50). Another hose is then attached to an intake valve on the bottom of the airplane through which blue juice is pumped into the lavatory tank. (*Id.* at ¶ 51). On certain models of Defendant US Airways' and Defendant AA's airplanes, the intake valves do not work, and have not worked for over five years. (*Id.* at ¶¶ 52-53). For these planes Defendants AA and US Airways directed their employees to fill empty Deer Park/Nestle five-gallon jugs, which are normally used to fill water coolers with fresh drinking water, with blue juice, and to take those jugs into the airplane's lavatories and fill each lavatory, a practice known as "top-filling." (*Id.* at ¶¶ 54-55).[7] After being used to top-fill the lavatories, the empty jugs were placed into the lavatory truck, next to or touching the same hose used to empty the human waste from the airplane, which would often be dripping human waste. (*Id.* at ¶ 56). Defendant AA's fleet service managers would then refill the jugs, which still contained an amount of blue juice from their use in top-filling the lavatories, with non-potable water obtained from a water station on the tarmac, and place the jugs in the employee break rooms and/or other areas of the airport where water coolers are located. (*Id.* at ¶¶ 57, 62-63). When a water cooler would empty, employees would take another full jug from the break room and place it on the water cooler. (*Id.* at ¶ 64). The jugs used by the employees included the same jugs that contained amounts of blue juice and which were refilled with non-potable water. (*Id.*). After one of these jugs was empty, the managers would either reuse it to top-fill lavatories or would return it to Deer Park/Nestle, without informing Deer Park/Nestle that it had been used to transport chemicals. (*Id.* at ¶¶ 59-60, 64). Based on the average number of flights involving airplanes with broken valves, Plaintiffs estimate that over the past five years, approximately 15,000 jugs have been filled with blue juice and later returned to Deer Park/Nestle. (*Id.* at ¶ 66-68).

Deer Park/Nestle water coolers jugs are made of polycarbonate and contain Bisphenol A ("BPA"). (*Id.* at ¶ 132). Under normal use, the BPA does not leech from the plastic jug into the water. (*Id.*). However, when exposed to toxic and corrosive chemicals, such as those found in blue juice, BPA can be released from the plastic jugs at dangerous levels. (*Id.*). Thus, the jugs filled with non-potable water contain not only amounts of blue juice, but also BPA, which

---

[6]   Plaintiffs do not specify the regulation(s) involved or the federal and/or state agency which promulgated the regulation(s).

has been linked to prostate cancer in men and breast cancer in women. (*Id.* at ¶¶ 132-36).

Plaintiffs allege that Defendants' practice of using the Deer Park/Nestle water jugs to top-fill airplane lavatories with blue juice and then filling the water jugs with non-potable water to be consumed by Defendants' employees, including Plaintiffs, exposed Plaintiffs, and those similarly situated, to hazardous chemicals in excess of normal background levels. (*Id.* at ¶¶ 150-52). This exposure significantly increased Plaintiffs risk of developing serious latent diseases, including prostate and breast cancer. The latency period for prostate cancer is approximately twenty years; while for breast cancer, the latency period is eight to fifteen years. (*Id.* at ¶¶ 154, 158-59). Plaintiff Trower, who is still employed by Defendant AA, was diagnosed with prostate cancer in 2011. (*Id.* at ¶¶ 105, 125). There are no allegations that the other eight plaintiffs have prostate or breast cancer.

As stated, in Count I, Plaintiffs assert a claim for medical monitoring on behalf of themselves and "all employees of American Airlines and/or US Airways who were exposed to toxic water as a result of improper handling, use, and refilling of Deer Park Nestle Jugs in the past seven (7) years." (*Id.* at ¶¶ 143, 150-60). Plaintiffs seek injunctive relief as well as compensatory and punitive damages. Defendants move for dismissal of the second amended complaint pursuant to Rule 12(b)(6), arguing that Plaintiffs' claims are all premised on work-related injuries and/or damages and, accordingly, the exclusive remedy available to Plaintiffs is

---

[7]     Plaintiffs allege that Defendant AA's use of Deer Park/Nestle water jugs to top-fill airplane lavatories violated unspecified regulations promulgated by the Federal Aviation Administration ("FAA"). (Sec. Am. Compl. at ¶¶ 101-103). While none of Plaintiffs' counts or claims are premised on Defendants' alleged violation of a specific FAA regulation, numerous courts have concluded, however, that there is no private right of action for the violation of FAA regulations. *See, e.g., Bowling Green v. Martin Land Dev. Co.*, 561 F.3d 556, 560 (6th Cir. 2009); *Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 57 (2d Cir. 2006). Likewise, there is no private cause of action for violations of the Occupational Safety and Health Act. *See, e.g., Siravo v. Crown, Cork, & Seal Co.*, No. CIV.A. 06-4308, 2007 WL 1118389, at *1 (E.D. Pa. Apr. 6, 2007); *see also Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156, 1164 (3d Cir. 1992).

to seek compensation pursuant to the PWCA.[8]  Plaintiffs disagree and, argue that because of the nature of their damages, their claims are not subject to the PWCA. [ECF 11 at 30-36].

**LEGAL STANDARD**

When considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)) (alterations in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege facts sufficient to 'nudge [his] claims across the line from conceivable to plausible.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570)).

---

[8]  Defendants raise additional arguments for the dismissal of Counts IV to VIII. [ECF 6 at 11-20]. However, because this Court is dismissing Count I, the only count which confers this Court with original jurisdiction over this action, this Court need not address these additional arguments.

**DISCUSSION**

The PWCA provides that "[e]very employer shall be liable for compensation for personal injury to, or for the death of each employe, by an injury in the course of his employment . . . ." 77 Pa. Stat. Ann. § 431. The PWCA further provides:

> *The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes*, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section [411(1), (2)] or occupational disease as defined in section [27.1].

*Id.* at § 481 (emphasis added). That is, "[e]mployees who are injured at work are limited to the compensation available to them under the PWCA and cannot separately sue their employers for personal injury." *Ochs v. Reading Hosp.*, 2016 WL 1567597, at *1 (3d Cir. Apr. 19, 2016); *see also Garlick v. Trans Tech Logistics, Inc.*, 636 F. App'x 108, 111 (3d Cir. 2015) ("[T]he only remedy an employee may pursue against his employer for a work-related injury is workers' compensation.").

Succinctly, Plaintiffs' claims of injuries stem from events that occurred during the course of their employment and work-related assignments, which are essentially based on allegations of the improper use and handling of Deer Park/Nestle five-gallon water jugs when top-filling blue juice in the lavatory in airplanes, and which are later recycled for drinking water. These allegations fall within the four corners of the PWCA, which is designed to cover injuries to an employee arising in the course of his employment. 77 Pa. Stat. Ann. § 411(1). These injuries include "occupational diseases," a term which is defined to include such things as poisoning from exposure to numerous listed chemicals and substances, cancers related to exposure to asbestos, and any other disease which a claimant is exposed to by reason of his employment that is related to the industry at issue and where the incidence of such disease is greater in that industry than in the general population. *Id.* at § 27.1. In addition, diseases that do not fall within

6

the definition of the statute may still qualify as "occupational diseases" subject to compensation under the PWCA if the disease is produced or aggravated by distinctive conditions of employment. *Al's Radiator Serv. v. W.C.A.B. (Jorden's Radiator Serv.)*, 630 A.2d 485, 488 (Pa. Commw. Ct.. 1993).[9]

There are situations, however, where the PWCA does not provide compensation for diseases that would otherwise constitute "occupational diseases." Specifically, the PWCA provides that "whenever occupational disease is the basis for compensation, . . . it shall apply only to disability or death resulting from such disease and occurring within three hundred weeks after the last date of employment." 77 Pa. Stat. Ann. § 411(2). Relying on this exception and citing to *Tooey v. AK Steel Corp.*, 81 A.3d 851 (Pa. 2013), Plaintiffs argue that because the potential for occupational diseases in this case, prostate cancer and breast cancer, have latency periods in excess of 300 weeks, these diseases are not "injuries" under the PWCA and, thus, their claims are not subject to the exclusivity provision of the PWCA. [ECF 11 at 30-36].

Plaintiffs' reliance is misplaced. *Tooey* involved a consolidated appeal of two suits, one brought by the estate of John Tooey, who was employed from 1964 until 1982, as an industrial salesman of asbestos products, and who developed mesothelioma in 2007, and died one year later; the other action was brought by the estate of Spurgeon Landis, who was exposed to asbestos throughout his employment which ended in 1992, and was diagnosed in 2007 with mesothelioma. *Tooey*, 81 A.3d at 856. The respective estates brought lawsuits against multiple defendants, including the decedents' employers. *Id.* These defendants argued that the claims

---

[9]     While neither party addressed whether the exposure here and the cancers it may cause fall within the statutory definition of "occupational disease," Plaintiffs contend in the second amended complaint that the prostate and breast cancers at issue may result from or be aggravated by their exposure to blue juice and/or its reaction to the Deer Park/Nestle water jugs they handle during the course of their employment, thus, making these potential cancers "occupational diseases" for purposes of the PWCA. *See Al's Radiator Serv.*, 630 A.2d at 488. This Court need not resolve this issue.

were barred by the PWCA's exclusivity provision.    *Id.*    The Pennsylvania Superior Court agreed, noting that the exclusivity provision of the PWCA applied to injuries occurring more than 300 weeks after the last day of employment, even though such injuries were not compensable under the PWCA.  *Id.* (discussing the unpublished Superior Court decision).  The Pennsylvania Supreme Court granted review to determine whether the manifestation of an occupational disease outside the 300-week period prescribed in the PWCA removed the claim from the purview of the act, such that the exclusivity provision did not apply.  *Id.* at 855.  After considering both the plain language of the exclusivity provision and the legislative intent in enacting the PWCA,[10] the Supreme Court held that the PWCA, and its exclusivity provision, did not "apply to claims for disability or death resulting from occupational disease[s] that manifest[] more than 300 weeks after the last occupational exposure." *Id.* at 865.

Plaintiffs argue that *Tooey* applies in this case where the occupational diseases at issue, prostate cancer and breast cancer, *may* manifest 300 weeks after the Plaintiffs terminate their employment with Defendant AA. While anything is possible, this argument is highly speculative and without legal support.    Unlike in *Tooey*, Plaintiffs, except for Plaintiff Trower, are

---

[10]    The PWCA "'substitutes a quick and inexpensive scheme to provide compensation for work-related injuries in place of the common law process where the employee must sue the appropriate parties for damages. Employers pay benefits at a set rate and they are immune from common-law liability.'" *Tooey*, 81 A.3d at 860 (quoting *Sporio v. W.C.A.B. (Songer Const.)*, 717 A.2d 525, 530 (Pa. 1998)).  The exclusivity provision of the PWCA,

> [R]eflects the historical quid pro quo between an employer and employee whereby the employer assumes liability without fault for a work-related injury, but is relieved of the possibility of a larger damage verdict in a common law action. The employee benefits from the expeditious payment of compensation, but forgoes recovery of some elements of damages. An employer's liability and the liability of its compensation carrier are exclusively governed by the [PWCA].

*Id.* (quoting *Alston v. St. Paul Ins. Companies*, 612 A.2d 421, 424 (Pa. 1992)).  The PWCA, however, is "remedial in nature and intended to benefit the worker, and, therefore, the Act must be liberally construed to effectuate its humanitarian objectives."  *Id.* (quoting *Giant Eagle, Inc. v. W.C.A.B. (Givner)*, 39 A.3d 287, 290 (Pa. 2012)).

8

asymptomatic and continue to work for Defendant AA. They have, therefore, not yet triggered the exception to the PWCA, an exception that arises 300 weeks after employment and the last occupational exposure. As noted, Plaintiff Trower has been diagnosed with prostate cancer and *is still employed* with Defendant.[11] With this material distinction, *Tooey* has no application here.

Plaintiffs also cite to *Scott v. Duquesne Light Co.*, No. 2014 WL 10920477 (Pa. Super. Ct. May 12, 2014), *McCloskey v. Cemline Corp.*, No. 2015 WL 7014702 (Pa. Super. Ct. June 17, 2015), and *Stellar v. Allied Signal, Inc.*, 98 F. Supp. 3d 790 (E.D. Pa. 2015), to support their argument that *Tooey* "remove[d] occupational diseases with latency periods of greater than 300 weeks from coverage under the [PWCA]." [ECF 11 at 32-33]. Plaintiffs are again misguided as none of these cases stand for the proposition asserted. In these three cases, the decedents were no longer employed by the defendant-employers, and developed mesothelioma more than 300 weeks after their respective last day of employment. *See Scott*, 2014 WL 10920477, at *1 (decedent ceased working for defendant in 1985 and was diagnosed with mesothelioma in 2007); *McClosky*, 2015 WL 7014702, at *3 (decedent's "workplace exposure ended by 1995 and he was diagnosed with mesothelioma in 2007, a period greater than 300 weeks"); *Stellar v. Allied Signal, Inc.*, 5:14-cv-5083 at [1] ¶¶ 23 (E.D. Pa. Sept. 3, 2014) (noting that the decedent's workplace exposure to asbestos ended in 1991 and he was diagnosed with mesothelioma in 2012). As such, these cases, like *Tooey*, provide Plaintiffs with no support for their argument.

Finally, Plaintiffs are asking this Court to expand the holding in *Tooey* to allow them, as claimants, to avoid the exclusivity clause of the PWCA whenever a claim is premised on the potential development of an occupational disease with a latency period which *might* cause it to

---

[11]     Plaintiff Trower has been diagnosed with prostate cancer, a cancer that, based on its usual latency period, Plaintiffs concede was likely a preexisting condition. Even if Plaintiff Trower's prostate cancer is linked to Defendants' conduct, nothing in *Tooey* stands for the proposition that Plaintiff Trower is entitled to bring a civil suit for a workplace occupational disease that actually manifested while he was employed by Defendant AA, as opposed to 300 weeks after his employment ended.

manifest more than 300 weeks after the last date of employment. Based on a fair reading of the PWCA and case law, this Court cannot grant Plaintiffs' request. The precedent is unequivocal. In considering the interplay between the PWCA's exclusivity provision and its definition of "injury," *Tooey* concluded that the exclusory provision did not apply to occupational diseases that actually *manifested more than 300 weeks after the last date of employment*. *Tooey*, 81 A.3d at 865. Because Plaintiffs continue to be employed by Defendant AA, the exception to the exclusivity provision found in *Tooey* does not apply. This is true for the eight Plaintiffs that do not have any occupational diseases[12] and to Plaintiff Trower who has been diagnosed with prostate cancer.[13]

---

[12]    Plaintiffs argue that to the extent this Court is not certain at this stage in the proceeding whether Plaintiffs' claims are subject to the PWCA's exclusivity provision, dismissal is not appropriate until after discovery commences and there is a medical determination of the latency periods for those Plaintiffs that do not have cancer. [ECF 11 at 38-40]. Because this Court has concluded that *Tooey* only exempts claims from the PWCA's exclusivity clause that involve occupational diseases that have, in fact, manifested 300 weeks after the last date of employment, the latency period of the cancers which Plaintiffs claim they are at additional risk of developing is not relevant and has no bearing on this Court's decision.

[13]    Plaintiffs assert that because prostate cancer has a latency period of approximately 20 years, an inference can be drawn that Plaintiff Trower's prostate cancer was a preexisting condition that was exacerbated by his exposure to the tainted water. [ECF 11 at 36-37]. Based on this assumption, Plaintiffs argue that Plaintiff Trower's manifestation of prostate cancer while he is employed by Defendant AA does not bar a civil action outside of the PWCA because a separate exception to the PWCA exists to support his claim. (*Id.*). Plaintiffs argue that *Martin v. Lancaster Battery Co.,* 606 A.2d 444 (Pa. 1992) provides an exception to the exclusivity provision where an employer misrepresents workplace dangers and thereby exacerbates a preexisting condition of an employee. (*Id.* at 37).

    Plaintiffs misunderstand the holding in *Martin*.  In *Martin*, the employer manufactured automotive and truck wet storage batteries, which resulted in extensive employee exposure to lead dust and fumes. *Martin*, 606 A.2d at 445.  Federal regulations required that the employees be tested on a regular basis for the lead content in their blood. *Id.* at 445-46.  The employer tested the plaintiff's blood, and intentionally altered the results of the tests before forwarding the results to the plaintiff. *Id.* at 446. The plaintiff was subsequently diagnosed with chronic lead toxicity, lead neuropathy, hypertension, gout, and renal insufficiency, the severity of which "would have been substantially reduced if his employer had not perpetrated a delay by failing to accurately report the elevated levels of lead in [the plaintiff's] blood." *Id.* The Pennsylvania Supreme Court, in considering whether the plaintiff's claims were subject to the PWCA's exclusivity clause, noted that there is a difference between employers who tolerate hazardous workplace conditions and those that actively mislead employees already suffering from the hazards. *Id.* at 448.  The Pennsylvania Supreme Court concluded that the exclusivity clause did not apply to the plaintiff's fraudulent misrepresentation claim under these circumstances. *Id.* at 447.

    Plaintiffs' claims against Defendants do not rise to the level of misconduct that occurred in *Martin*.  The *Martin* exception applies when an "employer conceal[s], alter[s] or intentionally

Based upon this analysis, because Plaintiffs' class action claim for medical monitoring relates to work-related conditions, events, and allegations regarding the drinking of water at the workplace and the improper handling and use of Deer Park/Nestle water jugs to top-fill lavatories in airplanes, this Court finds that this class action claim is subject to the PWCA's exclusivity provision.   Under these circumstances, Plaintiffs' class action claim for medical monitoring is dismissed.[14]

Plaintiffs' remaining claims are all state law claims brought on behalf of Plaintiffs only, and are not subject to the provisions of the CAFA.  In considering whether jurisdiction exists, this Court notes that two Plaintiffs are citizens of Delaware, (Sec. Am. Compl. at ¶¶ 20, 24), and Defendant AA is also a citizen of Delaware, [ECF 1 at ¶ 11].   Therefore, this Court lacks diversity jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1332(a).  In addition, because this Court has dismissed the only claim over which it had original jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), it declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, and will dismiss these claims without prejudice. *See, e.g., Eberts v. Wert*, 1993 WL 304111, at \*5 (E.D. Pa. Aug. 9, 1993), *aff'd,* 22 F.3d 301 (3d Cir. 1994)

---

misrepresent[s] information related to the work-related injury which result[s] in aggravation of that injury." *Winterberg v. Transp. Ins. Co.*, 72 F.3d 318, 323 (3d Cir. 1995) (quoting *Santiago v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 613 A.2d 1235, 1241 (Pa. Super. 1992)).  In other words, the employer must know about the work-related injury, in this case, prostate cancer, and misrepresent information concerning that injury. *See, e.g., Ranalli v. Rohm & Haas Co.*, 2983 A.2d 732, 735 (Pa. Super. 2009) (*Martin* "exception is where the employer knew its employee had a disease and withheld that information, causing an aggravation of the disease."); *Rakoczy v. Hubert C. Jasinski Laboratory, Inc.*, 2011 WL 5838271 (Pa. Com. Pl. Oct. 19, 2011) ("the *Martin* exception requires that the employer . . . have actual knowledge of the employee's . . . existing injury and to affirmatively conceal the dangerous exposure."). Plaintiffs do not allege that Defendants were aware of Plaintiff Trower's prostate cancer, or that they misrepresented information concerning his cancer to him. The *Martin* exception to the PWCA's exclusivity provision does not apply under the facts alleged.

[14]     This Court notes that costs for medical monitoring qualify as a claim under the PWCA. *E.g., Brendley v. Pennsylvania Dep't of Labor & Indus.*, 926 A.2d 1276, 1282 (Pa. Commw. Ct. 2007) (Medical monitoring claims must be determined by a workers' compensation judge.); *Fried v. Sungard Recovery Servs., Inc.*, 900 F. Supp. 758, 768 (E.D. Pa. 1995) (The PWCA "covers claims for emotional distress as well as claims for medical monitoring.").

("Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed.").

**CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss is granted. An Order consistent with this Memorandum Opinion follows.


NITZA I. QUIÑONES ALEJANDRO
*Judge, United States District Court*

12